UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-20221-CR-ALTONAGA

**UNITED STATES OF AMERICA**,

    Plaintiff,
v.

**DEREK RYAN CAMPTON**,

    Defendant.
_____/

**ORDER**

**THIS CAUSE** came before the Court on Defendant, Derek Ryan Campton's Amended Motion to Suppress Evidence and Statement [ECF No. 45], filed on August 6, 2024. The Government filed a Response [ECF No. 50] in opposition, to which Defendant filed a Reply [ECF No. 55]. On September 12, 2024, the Court held an evidentiary hearing [ECF No. 57] on the Motion. The Court has carefully considered the parties' submissions and statements, the record, witnesses' testimony, and applicable law. For the following reasons, the Motion is denied.

**I. BACKGROUND**[1]

On April 19, 2024, a Customs and Border Protection ("CBP") Air and Marine Operations ("AMO") Officer began tracking Defendant's vessel and determined it was travelling from Bimini, Bahamas toward the South Florida coast. (*See* Resp. 1–2).[2] The vessel's trajectory "correlated with intelligence received by CBP earlier that morning about migrants being smuggled into the

---

[1] As no hearing transcript has yet been prepared, the only citations to the factual record are to the parties' written briefing.

[2] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

United States from overcrowded stash houses in Bimini[.]" (*Id.* 2 (alteration added)). The AMO Officer contacted South Florida-based CBP AMO Officers, whose aircraft confirmed the vessel's trajectory. (*See id.*). The local CBP did not have a vessel immediately available to dispatch to Defendant's vessel, so it notified its partners at the Miami-Dade Police Department ("MDPD"). (*See id.*). The MDPD sent a police boat to the scene when Defendant's vessel crossed into Florida state waters, anticipating a Coast Guard vessel to be dispatched when available. (*See id.* 2–3).

The MDPD Officers stopped Defendant's vessel — which matched the description of the suspect vessel reported by CBP — in state waters in Biscayne Bay, near Key Biscayne, Florida. (*See id.* 2). MDPD Officers asked Defendant where he was coming from; he responded, "Fort Lauderdale." (*Id.*). He also stated there were only two people on board — Defendant and one other man ("the passenger"). (*See id.*). With Defendant's permission, the MDPD Officers boarded Defendant's vessel. (*See id.*). The MDPD Officers asked Defendant and the passenger basic questions, checked the vessel's registration, and asked for their identification. (*See id.* 3 (alterations added)). The passenger could not produce any form of identification and later informed the MDPD Officers he was not a U.S. citizen. (*See id.*)

Defendant "made it clear" he did not want the MDPD Officers to search the vessel's cabin because it was his home. (*Id.*). At this point, the MDPD Officers did not search the cabin;[3] they inspected the registration documents and asked Defendant about his business, which Defendant described as "consult[ing] with people buying new vessels." (*Id.* (alteration added)). After observing Bahamian currency in plain view on the main deck, the MDPD Officers asked Defendant what the last time was he had traveled to The Bahamas, and he advised two weeks

---

[3] An MDPD Officer briefly entered the main cabin with Defendant to retrieve the vessel's registration. (*See* Resp. 3).

before. (*See id.*). The passenger also told the MDPD Officers that he was from The Bahamas. (*See id.*).

Coast Guard Officers arrived around 30 minutes after the MDPD Officers, boarded the vessel, and informed Defendant they had to check all engine and bilge spaces.[4] (*See id.* 3–4). Two of the MDPD Officers joined the Coast Guard Officers' search. (*See id.* 4). First, the Coast Guard Officers inspected the bilges in the main cabin and noticed several pairs of seemingly men's shoes of various sizes — which Defendant claimed belonged to his wife — and several large jugs of water, large quantities of solo cups, chips, and juice. (*See id.*).

While the Coast Guard Officers continued their inspection, the MDPD Officers returned to the main deck.[5] (*See* Resp. 4). As the Coast Guard Officers "appeared to be winding down their [] inspection[,]" the MDPD Officers went back down to the main cabin and told Defendant they needed to check the cabins "to ensure that there was not anyone in there with a gun." (*Id.* 4–5 (alterations added)).

Defendant protested and insisted the MDPD Officers needed a warrant. (*Id.* 5). After Defendant "became more agitated and defensive," the MDPD Officers handcuffed Defendant. (*Id.* 5 (alteration added)). One of the MDPD Officers then opened a cabin door, revealing "a group of people[] who were later determined to be migrants who did not have permission to be in the United States." (*Id.* (alteration added)). The Coast Guard Officers opened a different cabin door and

---

[4] "Bilges are spaces at the bottom of a vessel where oil and water can accrue if the vessel has structural or mechanical problems." (*Id.* 4 n.4).

[5] At this point, one of the MDPD Officers noticed a snorkeling mask on board, which he thought was "sufficient evidence to allow them to search anywhere a fish could be stored." (*Id.* 4).

3

found a second group of people, migrants who had no permission to be in the United States.[6] (*See id.*).

On May 23, 2024, the Government filed an Information [ECF No. 23] charging Defendant with one count of "Encouraging and Inducing Aliens to Enter the United States" in violation of 8 U.S.C. section 1324(a)(1)(A)(iv). (*Id.*). Defendant asserts the search of his vessel was illegal and seeks to suppress the evidence found, and statements made, during or because of the search. (*See generally* Mot.).

## II. ANALYSIS

Defendant argues the MDPD's stop and search of his vessel violated his Fourth Amendment rights. (*See generally id.*). He asserts all evidence obtained because of the search — including the discovery of the migrants aboard the vessel and any statements Defendant made after his arrest — should be suppressed as fruit of the poisonous tree. (*See id.* 10–12). The Government insists the stop and search were lawful and even if the MDPD Officer wrongfully opened the door to the cabin that first revealed the migrants, the Coast Guard Officers would have inevitably discovered the migrants by the end of their lawful search. (*See generally* Resp.). Thus, given the inevitable discovery doctrine, the Government argues there is no basis to suppress the evidence and Defendant's subsequent statements. (*See id.*).

Defendant first argues the MDPD Officers had no authority to board and search his vessel without probable cause.[7] (*See* Mot. 2–6). Under 19 U.S.C. section 1581(a), "[a]ny officer of the

---

[6] The passenger was also found to be a "migrant without legal immigration status in the United States." (*Id.* 5).

[7] As a preliminary matter, the Court addresses and rejects Defendant's assertion that during their initial encounter with him, the MDPD Officers could not search the vessel's cabin because the vessel is his home. (*See* Resp. 3). A vessel is not endowed with the Fourth Amendment protections of a home where it is "obviously readily mobile by the turn of an ignition key[;]" "subject to a range of police regulation inapplicable to a fixed dwelling[;]" and "so situated that an objective observer would conclude that it was being used not as a residence, but as a vehicle." *United States v. Albers*, 136 F.3d 670, 673 (9th Cir. 1998)

customs may at any time go on board of any vessel . . . within the customs waters . . . and examine the manifest and other documents and papers and examine, inspect, and search the vessel . . . and every part thereof and any person, trunk, package, or cargo on board[.]" *Id.* (alterations added). Certainly customs officers may conduct searches at the border[8] "without probable cause and without a warrant[;]" these qualify as "reasonable" under the Fourth Amendment. *United States v. Ramsey*, 431 U.S. 606, 619 (1977) (alteration added; quotation marks and footnote call number omitted). According to Defendant, because the MDPD Officers are *not* customs officers — in contrast to the Coast Guard Officers, who are — the MDPD Officers needed probable cause to stop, board, and search his vessel. (*See* Mot. 3).

The Government disagrees, pointing to *State v. Casal*, 410 So. 2d 152 (Fla. 1982). (*See* Resp. 9); *see also United States v. Caraballo*, 595 F.3d 1214, 1225 (11th Cir. 2010) (citing *Casal* and noting that "under Florida law, an officer does not need probable cause to stop a boat to check for fishing permits."). *Casal* held *state* officers may "random[ly] stop[] and brief[ly] det[ain] [] motorboats for the limited purpose of checking fishing permits, registration certificates[,] and safety equipment" without probable cause. *Id.*, 410 So. 2d at 155 (alterations added). In his Reply, Defendant insists the MDPD Officers did not stop his vessel for any of these purposes, but rather, "because CBP did not have a vessel that was able to respond" to its "'hunch' that the vessel may have illegal immigrants" on board. (Reply 2).

---

(alterations added; quotation marks and citations omitted) (applying the Supreme Court's decision in *California v. Carney*, 471 U.S. 386, 393 (1985), regarding fully mobile motor homes, to houseboats). Defendant's vessel, actively in motion at the time of the stop, has all these characteristics.

[8] Border searches may "take place not only at the border itself, but at its functional equivalents as well." *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973); *see also United States v. Hidalgo-Gato*, 703 F.2d 1267, 1273 (11th Cir. 1983) (holding "the contiguous zone is the functional equivalent of the border").

Defendant's argument fails for two reasons. First, at the hearing, Coast Guard Officer Mackenzie Eichenlaub testified that the "mission" of the stop was, indeed, to enforce recreational boating safety. Second, even if Defendant considers this reason pretextual to the MDPD Officers' true reason, he provides no support for the notion that the MDPD Officers could not have used the purpose of checking safety equipment as a pretext for their "hunch" that smuggled migrants were hidden on board. (*See generally* Reply); *see Whren v. United States*, 517 U.S. 806, 813 (1996) (noting "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis" (alteration added)).

Once on board the vessel, the MDPD Officers only inspected the registration documents. (*See* Resp. 3). The MDPD Officers waited for the Coast Guard Officers to arrive before conducting any inspection or search of the vessel. (*See id.* 3–4). The Court is therefore not persuaded that the MDPD Officers violated Defendant's Fourth Amendment rights by stopping and boarding his vessel.

The Government advances two arguments for the MDPD and Coast Guard Officers' authority to search Defendant's vessel without probable cause. (*See id.* 10–14). First, the Government argues that the Coast Guard Officers would have "inevitably and independently discovered all of the migrants even if the MDPD Officer had not [initially] opened the cabin door[.]" (*Id.* 12 (alterations added; emphasis omitted)). Next, the Government contends that the MDPD Officers' safety concerns justified a "limited protective sweep[.]" (*Id.* 13 (alteration added)). The Court agrees with the first argument and so does not address the second.

"The 'inevitable discovery' doctrine applies when the government can show by a preponderance of the evidence that it would have discovered the evidence by some other lawful means." *McKathan v. United States*, 969 F.3d 1213, 1232 (11th Cir. 2020) (citations omitted).

6

For the doctrine to apply, "the government must also demonstrate that before the unlawful activity occurred, it was actively pursuing the lawful means that would have rendered discovery inevitable." *Id.* (citation omitted). The Government states the Coast Guard Officers would have discovered the migrants during their inspection even if the MDPD Officers had never opened the cabin door. (*See* Resp. 12). According to the Government, the Coast Guard Officers "would have eventually verified that there was not any water in the forward or aft bilges[,]" and to do so, they "would have had to enter the two cabins, and inevitably would have found the migrants hiding there." (*Id.* (alteration added)).

At the hearing, Defendant argued the Coast Guard Officers had already finished their inspection by the time the MDPD Officer opened the cabin door, revealing the migrants. Thus, Defendant contends the Coast Guard Officers would not have lawfully and inevitably discovered the migrants without the MDPD Officers' interference.

The Court credits the Government's version of the events. Coast Guard Officer Eichenlaub testified he was not finished with his safety inspection and was not leaving the vessel at the time the migrants were discovered. Eichenlaub explained he checks every bilge space as a safety protocol on every boarding. This testimony was verified by the video clip taken from Officer Kennedy's body camera.

Having reviewed the body camera video coverage, the Court finds the Coast Guard Officers were not finished with their search at the time the MDPD Officer opened the first cabin door, and they would have inevitably discovered the migrants when they opened the cabins to verify there was no water in the bilges. Regardless of whether the MDPD Officers' search was permissible, the evidence is not suppressed under the inevitable discovery doctrine.

## III.  CONCLUSION

Being fully advised, it is

**ORDERED AND ADJUDGED** that Defendant's Amended Motion to Suppress Evidence and Statement **[ECF No. 45]** is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 18th day of September, 2024.

_____
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc: counsel of record